[S. F. No. 11025.   In Bank.—October 31, 1925.]

## SIERRA AND SAN FRANCISCO POWER COMPANY, Respondent, v. UNIVERSAL ELECTRIC & GAS COMPANY, Appellant.

[1] PUBLIC UTILITIES—SALE OF ELECTRICAL ENERGY—FILING OF CONTRACT WITH RAILROAD COMMISSION—SUBSEQUENT ACCEPTANCE OF LESS THAN AUTHORIZED RATES.—Where the contract between a wholesaler and a retailer of electrical energy for the purchase by the latter from the former of electrical energy was filed with the Railroad Commission under the plain mandate of the Public Utilities Act as amended in 1915, although the contract was entered into prior to such amendment, the rates and charges specified therein became the established and only lawful rates which said wholesaler could charge or receive unless and until a change in such rate was effected in accordance with the statutory requirements; and, notwithstanding the said wholesaler thereafter, pursuant to a purported agreement with said retailer, for a period of time charged and received less than the regularly authorized rates, it had the right to revert to the legal rate without the sanction of the commission.

[2] ID. — OBLIGATION TO FILE SPECIAL CONTRACTS — STATUTORY CONSTRUCTION.—Under section 14, subparagraph (b), of the Public Utilities Act, public utility corporations engaged in the sale of electrical energy were required to file not only the general rate schedules under which any consumer might be supplied with energy without a special contract but also all special contracts affecting or relating to rates, such as contracts for the sale of electrical energy to other public utility corporations engaged in the retailing of such energy.

[3] ID.—THEORETICAL DELIVERY—CHANGE OF METHOD OF COMPUTATION —NECESSITY OF FILING MODIFICATION.—The fact that under the original contract between plaintiff and defendant, the charge to the latter for electrical energy was based on the theoretical rather than the actual delivery, and that their subsequent agreement (represented by an exchange of letters) merely changed the method of computing such delivery, did not obviate the necessity of filing such subsequent agreement with the Railroad Commission, where the purpose of such arrangement and its practical effect, if legally accomplished, was to modify the terms of the original contract

1.   See 9 R. C. L. 1190.
3.   See 22 Cal. Jur. 64.

so as to render the energy charge less than that provided for in the original agreement.

[4] ID.—DUTY OF FILING MODIFIED CONTRACT—ESTOPPEL TO COLLECT LEGAL CHARGE.—While it was the duty of plaintiff to file such letters constituting a modification of the original contract with the Railroad Commission, and its breach of that duty rendered it liable to the penalties prescribed by law, defendant could have protected its rights by filing the modified contract with the commission, and, where defendant did not do so, the failure of plaintiff to perform its full duty in the premises did not place defendant in a position to avoid payment of the legal charge.

[5] ID. — ACCORD AND SATISFACTION — PAYMENTS BASED ON ILLEGAL CONTRACT—IMPLICATION FROM PROSCRIBED ACTS.—An accord is an agreement subject to the same rules as other agreements; and an agreement of accord and satisfaction cannot arise by implication from the act of a wholesaler of electrical energy in accepting from a retailer thereof the amounts tendered by the latter, where such amounts are less than claimed by the wholesaler and are less than the amounts due based upon the rate specified in the contract duly filed with the Railroad Commission.

[6] ID.—PAYMENTS BASED ON INVALID AGREEMENT—CONSIDERATION—ACCORD AND SATISFACTION—FINDINGS.—In this action to recover a balance alleged to be due from a retailer to a wholesaler of electrical energy, in which the defendant pleaded an accord and satisfaction based upon the payment by it to plaintiff of the amount due according to a modified agreement between them, but which agreement was invalid because not filed with or approved by the Railroad Commission, it having satisfactorily appeared that the amount actually due was in dispute at the time of the acceptance and retention by plaintiff of the several checks from defendant and that the tender of such checks was not subject to the condition that acceptance of each check would be satisfaction in full, and it also having been clear that the element of consideration for the agreement of accord was lacking, the trial court was correct in finding and concluding that there had been no accord and satisfaction.

(1) 20 C. J., p. 330, n. 35.    (2) 20 C. J., p. 330, n. 34.    (3) 20 C. J., p. 330, n. 35.    (4) 20 C. J., p. 330, n. 34.    (5) 1 C. J., p. 560, n. 75.    (6) 1 C. J., p. 528, n. 69, p. 557, n. 55.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John J. Van Nostrand, Judge. Affirmed.

4.  See 22 Cal. Jur. 65.

5.  See 1 Cal. Jur. 127; 1 R. C. L. 177.

The facts are stated in the opinion of the court.

William Kehoe for Appellant.

Thomas H. Breeze and Chickering & Gregory for Respondent.

Carl I. Wheat and Woodard M. Taylor, as *Amici Curiae* in Support of Respondent.

SHENK, J.—This is an appeal from a judgment in favor of the plaintiff for the sum of $13,359.68 on account of an alleged balance due for electrical energy furnished by the plaintiff to the defendant.

It is alleged in the complaint that on the ninth day of July, 1915, the parties hereto entered into a contract whereby the plaintiff agreed to sell and the defendant agreed to buy for a period of eight years all of the electrical energy that might be required by the defendant in the regular course of its business in excess of that which might be generated in its own plant; that the defendant agreed to pay for energy at the rate per month of $1.80 per kilowatt for the first 2,000 kilowatts maximum demand, with a sliding schedule downward for each successive 2,000 kilowatts maximum demand; that in addition thereto an energy charge was to be paid of four mills per kilowatt hour for energy taken as determined by the integrating watt hour meter readings; that pursuant to the contract the plaintiff sold and delivered energy to the defendant from August 1, 1918, to December 3, 1919, on account of which the total price to be paid was $255,-623.55; that the defendant had paid the sum of $241,249.71 and no more. Plaintiff prayed judgment for the difference, to wit, $14,373.84 and interest. The defendant answered denying the indebtedness, alleging a modification of said contract by mutual consent in January, 1917, the payment of bills by monthly remittances in accordance with the modified contract and the acceptance by the plaintiff of such payments in full satisfaction. The court found for the plaintiff and entered judgment for the amount demanded less the sum of $1,016.16, which the plaintiff admitted to be due to the defendant in accordance with the allegations of a counterclaim duly pleaded.

The defendant contends that the evidence is insufficient to support the findings, that the judgment is not supported by the findings, and that the decision is against law.

It appears from the evidence that at all times involved in this action the plaintiff and the defendant were public utility corporations, the plaintiff being a wholesaler and the defendant a retailer of electrical energy in San Francisco; that the rates specified in the contract of July 9, 1915, provided first for an energy charge at a fixed rate per kilowatt hour for energy actually used, and, secondly, a service charge at a specified rate per kilowatt hour based upon the maximum demand during the month, the maximum demand being defined as "the sum of the greatest number of kilowatt hours taken by purchaser . . . during any four consecutive fifteen minute intervals during each month"; that the contracting parties operated under this contract until January, 1917, when the plaintiff endeavored to persuade the defendant to shut down its steam plant and take all of its power from the plaintiff. Defendant objected to the proposal on the ground that it was not assured of the reliability of the plaintiff's service and that by operating its own steam plant it was enabled to reduce the peak load, thus lowering the maximum demand during the month and correspondingly decreasing the amount of service charge which it was required to pay. After negotiations, however, an oral agreement was entered into whereby the defendant was to shut down its steam plant, the plaintiff to operate its steam plant seven days a week and the maximum demand on which the service charge was based was to be figured at nine-tenths of the actual amount thereof. Thereafter letters were exchanged purporting to confirm the oral agreement. Under date of January 2, 1917, the plaintiff addressed a letter to the defendant as follows: "In consideration of the Universal Electric & Gas Company giving the Sierra & San Francisco Power Company additional load between the hours of 7:15 a. m. and 11:00 p. m. to the full capacity of the present cable . . . this company will operate its steam plant between the hours of 7:15 a. m. and 11:00 p. m. and will also assume nine-tenths of the maximum demand being charged as the maximum demand charge, according to the contract. The minimum service charge under this arrangement is to be based upon 1500 kilowatts. Should your maximum demand

be less than 1500 kilowatts, then and in that event, the nine-tenths factor shall not apply. . . . You stated to the writer that you would operate this month, January, 1917, under the terms above named, in order to determine whether or not this would be satisfactory operative conditions." On January 10, 1917, the defendant replied: "Confirming our recent conversation and your letter of January 2nd, 1917, we understand that should our peak load equal 1500 kilowatts or more we are to be billed for nine-tenths of whatever that peak may be, or at the old rate of $1.62 per k. w. Should the peak be less than 1500 k. w. then and in that event the rate to remain at $1.80 per k. w. Also, we understand that your steam plant is to run Sundays as on week days. Trusting this will make a clear record of our understanding and thanking you for your courtesy in the matter, we remain," etc. On January 15, 1917, the plaintiff in turn replied: "Referring to your letter of January 10th, I beg to advise you that your understanding does not agree with ours as to the application of the 9/10 factor. While the resulting bill would be the same in either event (viz.: by applying the 9/10 factor to the rate, according to your understanding, or applying the 9/10 factor to the peak, according to our understanding) it was our understanding that the peak and not the rate should be the method."

It will be noted from the foregoing correspondence that while there was some disagreement as to the application of the nine-tenths factor the result was the same as far as the revenues of the plaintiff and payments by the defendant were concerned, for in billing the defendant for energy furnished for the month of January, 1917, to and including the month of July, 1918, the plaintiff applied the nine-tenths factor in ascertaining the maximum demand charge and the bills were paid by the defendant as submitted. On July 31, 1918, the plaintiff gave to the defendant a written notice of termination of the special arrangement as follows: "Owing to the greatly increased cost of labor and materials and to more difficult operating conditions which have very largely increased the cost of production, we feel that the special concession covered by our letter of January 15th, 1917, by Mr. W. L. McKinley, should not be longer continued. We will therefore cancel the arrangement covered by the

aforesaid letter and proceed on the contract basis beginning August 1st, 1918.''

After the notice of termination was given and continuously thereafter during the entire period covered by this controversy all bills rendered by the plaintiff were based on the full maximum demand charge in accordance with the original contract. Payments thereon were made by the defendant as hereinafter more particularly noted. On June 15, 1921, the plaintiff made formal demand for the payment of the difference between the amounts claimed to be due computed according to the original contract and the amounts paid computed on the basis of the reduced rate. Upon the refusal of the defendant to pay this action was brought.

When the contract of July 9, 1915, was entered into the Railroad Commission did not have jurisdiction over the rates, charges, and contracts of the parties hereto for the reason that they were operating within a municipality which at that time had not surrendered its powers of control in such matters to the commission. (Const., art. XII, sec. 23, amendment approved October 10, 1911; sec. 82, Public Utilities Act, Ex. Sess. 1911, p. 62.) After the amendment of section 23 of article XII of the constitution in 1914, the legislature adopted the present Public Utilities Act. (Stats. 1915, p. 115.) This act went into effect August 8, 1915. By this legislation the Railroad Commission acquired jurisdiction of the parties to said contract with reference to their rates and service. Section 14 (b) of the act of 1915 provides: "Under such rules and regulations as the commission may prescribe, every public utility . . . shall file with the commission within such time . . . as the commission may designate . . . all contracts . . . which in any manner affect or relate to rates, tolls, . . . or service." In admitted compliance with general order No. 45 of the Railroad Commission the plaintiff on October 6, 1915, filed with the commission a summary of the rates provided for in the contract of July 9, 1915, listed as a deviation from the regularly filed electrical rates. Thereafter the commission requested that the complete contract be filed in accordance with the general order and this was done on February 16, 1916. Section 15 of the Public Utilities Act provides: "Unless the commission otherwise orders, no change shall be made by any public utility in any rate, fare, toll, rental, charge, or classification,

or in any rule, regulation or contract relating to or affecting any rate, . . . except after thirty days' notice . . . stating plainly the change or changes to be made in the schedule or schedules then in force, and the time when the change or changes will go into effect." And subparagraph (b) of section 17 of the act provides: " . . . no public utility shall . . . receive a greater or less or different compensation . . . than the rates, tolls, rentals and charges . . . as specified in its schedules on file . . . nor shall any such public utility refund or remit, directly or indirectly in any manner or by any device, any portion of the rates, tolls, rentals and charges so specified, nor extend to any corporation or person any form of contract or agreement . . . except such as are regularly and uniformly extended to all corporations and persons, *provided,* that the commission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility."

[1] Under the plain mandate of the statute it is clear that when the contract of July 9, 1915, was filed with the commission the rates and charges specified therein became the established and only lawful rates which the plaintiff could change or receive unless and until a change in such rates was effected in accordance with the statutory requirements, and no such change was made concerning the rates here in question. The letters of January 2, 10 and 15, 1917, were not sent to the Railroad Commission until February 14, 1919, more than six months after the modification provided for therein had been terminated by the plaintiff and then only at the request of the commission and there is no evidence that said letters were ever filed. The purported modification of the agreement was, therefore, ineffective. (*Calistoga Elec. Co.* v. *Napa Valley Elec. Co.,* 11 Opinions and Orders Railroad Cal. Com. 974.) Notwithstanding the plaintiff had been charging and receiving less than the regularly authorized rates, it had the right to revert to the legal rate without the sanction of the commission. (*In re Village of Cambria,* P. U. R. 1916E, 519.)

[2] It is insisted by appellant that the contract of July 9, 1915, was not required to be filed with the commission because it "was a special contract not available to the general public." To this contention the language of the statute is

a complete answer, wherein it is provided that every public utility shall file with the commission its rates or schedules and *all contracts which in any manner affect or relate to rates* (sec. 14, subparagraph [b]). This provision would include not only the general rate schedules under which any consumer might be supplied with energy without a special contract but also all special contracts, such as the one involved herein, affecting or relating to rates. The statute is too plain to admit of any other meaning.

[3] Such being the status of the original contract, the defendant then takes the position that the change made by the letters of January, 1917, did not affect the rates to be charged and collected by the plaintiff nor change or affect the quantity of electrical energy actually purchased; that the sole change made was in determining the maximum demand; that the maximum demand was actually delivered only one hour in the month and was charged for as though it had been actually delivered every hour during such month; that it was a charge for service rendered in large part in theory only, and that the parties to the contract had the lawful right to modify the same as to change the difference between the actual and theoretical delivery. The theory advanced by the defendant is technical and interesting but it is unnecessary to further discuss it for the reason that whatever the theory may have been the purpose of the arrangement and its practical effect, if legally accomplished, was to modify the terms of the original contract so as to render the energy charge, which the plaintiff was entitled to demand and the defendant was bound to pay, less than that provided for in the original agreement. When so considered the arrangement may properly be termed a "device" by which a portion, to wit, ten per cent of the legal charge, was remitted to the defendant in contravention of subparagraph (b) of section 17 of the Public Utilities Act. If a public carrier should say to a shipper to whom it desired to grant a preference, "we will bill you each month at the rate per hundred pounds specified in our legally established tariff, but in making out our bills we will bill you only for ninety per cent of the actual weight shipped by you during the month," could it be doubted that such an arrangement would effectuate a reduction of the rate in favor of the shipper? The defendant apparently considered that the

letters of January, 1917, should have been filed for by its letter of September 7, 1918, in response to plaintiff's notice of cancellation of July 31, 1918, it wrote to the plaintiff as follows: "Referring to your letters of January 2nd and 15th, in which you agreed to bill us on a basis of 9/10 the maximum demand . . . we would ask, were those letters filed with the Railroad Commission as a modification of our power contract, as required? If not they should of course be filed and the rate having been lowered it cannot therefore be arbitrarily raised at the pleasure of one of the parties to the agreement." The defendant was correct in its conclusion that it was necessary to file the letters with the commission but its further conclusion that the plaintiff, having theretofore charged and collected compensation on the basis of an unauthorized rate, could not revert to the legal rate as was done in this case, is not approved.

[4] The defendant further contends that if said letters were required to be filed it was the duty of the plaintiff to file them and to allow the plaintiff to recover in the face of such breach of duty would be to permit the plaintiff to "take advantage of its own wrong," citing section 3517 of the Civil Code. But that maxim of jurisprudence is not of universal application. It was not intended to qualify any of the provisions of the code but to aid in their just application (Civ. Code, sec. 3509). While it may properly be said that the plaintiff was in duty bound to file the modified contract with the Railroad Commission and failing to do so was subject to the penalties prescribed by law, it must also be said that the defendant was not wholly blameless, for it concurred in an arrangement which was contrary to the statute. It could have protected its rights by filing the modified contract with the commission. The documents providing for the modification were presumably in its possession as well as in the possession of the plaintiff. The argument also loses sight of one of the purposes of the regulation of rates of public utility corporations. The public in general and the consumers in particular are interested in the relations existing between the corporation and each of its consumers. To accede to the position of the defendant would be to permit a public utility corporation to deplete its revenues by special secret arrangement with preferred consumers, thus leading to possible financial em-

barrassment or depreciated service and without recourse as against the preferred consumer. It seems obvious that a consumer who has participated in such a prohibited arrangement is not in position to avoid payment of the legal charge on the ground that the other party to the transaction had not done its full duty in the premises.

[5] The trial court found and decided that there had been no "accord and satisfaction" of the claim of plaintiff against defendant in whole or in part. The defendant attacks this finding as being contrary to the law and the evidence. Upon receipt of the bill covering power delivered for the month of August, 1918, the defendant refigured the same applying the nine-tenths factor which made a reduction for that month of $420.12. A new bill with voucher attached, based on the refigured amount, was prepared by the defendant and transmitted to the plaintiff together with a check for the smaller amount. The wording of the voucher was as follows: "Received of Universal Electric & Gas Co. in full payment of above account six thousand eight hundred twenty-six & 42/100ths dollars." The plaintiff refused to sign the voucher but wrote the defendant as follows: "We enclose herewith a receipt for $6,826.42, the amount of your check on account of August, 1918, power bill, $7,246.54. Because of the deduction which you have made from our bill we are obliged to furnish you with a receipt on account. We have accepted the check under protest and have passed the same to your credit." The following is the form of the receipt: "Received of Universal Electric & Gas Co. Six thousand eight hundred twenty-six & 42/100ths dollars to apply on account of August, 1918, power bill. Unpaid balance, ·$420.12." The same procedure was followed by both parties each month thereafter to and including February, 1919. From March to June, 1919, the defendant continued to send the vouchers to the plaintiff with checks for the smaller amount. As to these vouchers the plaintiff signed and returned them, first crossing out the words "in full payment of above account" and inserting the words "on account" of the bill for the particular month. Beginning July, 1919, and ending December, 1919, when the service was apparently discontinued by mutual consent, the defendant on receipt of each monthly statement for that period made out a bill for the smaller amount and submitted it

with a voucher check on the back of which was the following: "If not correct return without alterations and state differences. Make all indorsements below. This check is hereby accepted by the payee in full payment of the within account and indorsed as follows." These checks were indorsed by the plaintiff without change or alteration. In addition to the foregoing procedure it appears that early in the period covered by this controversy the parties referred the matter to their respective attorneys and payments were thereafter made by the defendant through its attorney with an accompanying letter beginning December 9, 1918, as follows: "This check represents the amount admitted to be due by the Universal Company on account of the items for electrical energy furnished and charged in your bill in the month of October, 1918. The check does not include two items mentioned in that account, viz.: the surcharge of one and one-half mills per K.W.H. and in addition deducts 1/10th of the maximum demand charge . . . It was the expectation of the Universal Company and of myself that before tendering the enclosed check it would take up with your attorney . . . the items in question as to which payment is not made . . . and if agreeable to you, this procedure will be adopted. I am in hopes of obviating the necessity of resorting to the arbitration provisions of 1915 contract . . . " The checks for the remaining months of the period were transmitted through the defendant's attorney and were accompanied by his letters identical in form as follows: "Herewith please find Universal Electric & Gas Co.'s check . . . being the amount admitted to be due on your bill . . . The check is similar to that sent you with my letter of December 9, 1918, covering October bill, the same deductions being made from your statements as rendered and the same reservations and conditions being present as regards the items withheld . . . As on previous occasions you will undoubtedly not be in a position to sign the full payment voucher accompanying the check, but if you will attach a receipt and return the same with the voucher, pending final adjustment, this will be appreciated."

An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled (Civ. Code, sec. 1521). Acceptance by the creditor of the consideration

of an accord extinguishes the obligation, and is called satisfaction. (Civ. Code, sec. 1523; *Creighton* v. *Gregory,* 142 Cal. 34, 41 [75 Pac. 569].) Since an accord is an agreement it is subject to the same rules applicable to other agreements (1 Cal. Jur. 127). "The discharge of claims by way of accord and satisfaction is dependent upon contract express or implied; and it follows that the essentials necessary to valid contracts generally must be present in a contract of accord and satisfaction. Therefore there must be (1) a proper subject matter; (2) competent parties; (3) a consent or meeting of the minds of the parties; and (4) a consideration." (1 R. C. L. 178, sec. 3.) The agreement of accord and satisfaction which the defendant here contends for could under the evidence arise only by implication. The statute expressly forbade the plaintiff to charge or receive compensation for electrical energy at any rate other than that specified in the contract duly filed. It therefore could not lawfully accept the amounts tendered by the defendant. In view of this situation counsel for the plaintiff very pertinently inquires, "How can the law imply that plaintiff has done that which the statute expressly forbids?" We think the answer must be that a contract of accord thus arising cannot properly be brought into being with one of the essentials of a contract lacking, to wit, a lawful subject matter. Since an accord and satisfaction is the result of an agreement it must also be consummated by a meeting of the minds of the parties. "The great weight of authority in American courts undoubtedly supports the rule that where the amount due is in dispute, and a check for an amount less than that claimed is sent to the creditor with a statement that it is sent in full satisfaction of the claim, and the tender is accompanied by such acts or declarations as amount to a condition that if the check be accepted at all it is accepted in full satisfaction of the disputed claim, and the creditor so understands, its acceptance by the creditor constitutes an accord and satisfaction, even though the creditor states at the time that the amount tendered is not accepted in full satisfaction. (Wald's Pollock on Contracts, 3d ed., p. 839.) Whether there was a dispute concerning the amount due and whether the tender was on condition that acceptance would be in full satisfaction, are primarily questions of fact for the trial court."

(*Lapp-Gifford Co.* v. *Muscoy Water Co.*, 166 Cal. 25, 27 [134 Pac. 989, 990].) **[6]** From the oral evidence in the case at bar and the conduct of the parties as indicated by the documentary evidence above noted, it satisfactorily appears that the amount actually due was in dispute at the time of the acceptance and retention of the several checks and that the tender was not subject to the condition that acceptance of each check would be satisfaction in full. It is also clear that the element of consideration for the agreement of accord was lacking. The court was, therefore, correct in finding and concluding that there had been no accord and satisfaction. Furthermore, the contract of July 15th expressly provided that "In case purchaser at any time shall dispute any bill rendered by Power Company under the provisions of this agreement, then within the period fixed herein for the payment of such bill, purchaser shall pay Power Company the amount which it admits to be due by it on account of the items charged in such bill without deduction . . . and shall forthwith offer to submit to arbitration as hereinafter provided, the question with respect to the balance unpaid by it . . . " In view of the foregoing provision of the contract it seems reasonable to conclude that the defendant had no right to attach a condition to its payment of the amount conceded to be due and by admittedly failing to offer to submit to arbitration subject the plaintiff to its claim of accord and satisfaction.

From what has been said it is unnecessary to discuss the question of whether or not the modification of the original contract was effective only during the month of January, 1917, as contended by the plaintiff, or during the entire period covered by the controversy, as contended by the defendant. In either event the modification did not become legally effective, and the period of its duration was therefore of no consequence.

The judgment is affirmed.

Richards, J., Seawell, J., Waste, J., Myers, C. J., Lawlor, J., and Lennon, J., concurred.

Rehearing denied.